## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRITTANY M. SWEENEY, | CASE NO. 3:13-cv-02233-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 8, 9, 10, 11 |

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Brittany Sweeney for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). The ALJ found that Plaintiff could engage in a range of light work, and a vocational expert testified that various positions existed in the national economy that Plaintiff could perform, such as potato chip sorter.  Plaintiff was nineteen-years old on the date of her application. She asserts that back pain renders her unable to work, but she either worked (sometimes up to almost sixty hours per week) or certified that she was able to work throughout the relevant period. Although one doctor, Dr. David Baker, indicated that she "might" need surgery and, if she went through with the surgery she "might" be temporarily disabled, no treating physician actually opined that her back impairment rendered her unable to work.  She had only minimal objective abnormalities and denied having musculoskeletal pain on many occasions during the relevant period. She asserts that her mental

impairments rendered her unable to work, but she refused to obtain mental health treatment because she did not want medications to make her gain weight. Although Plaintiff asserts that the ALJ improperly evaluated her impairments, credibility, and medical opinions, the Court finds that substantial evidence supports the ALJ's decision and denies Plaintiff's appeal.

## II.     Procedural Background

On October 7, 2009, Plaintiff filed an application for SSI under Title XVI of the Social Security Act and for DIB under Title II of the Social Security Act. (Tr. 272-283). On May 21, 2010, the Bureau of Disability Determination denied these applications (Tr. 121-145), and Plaintiff filed a request for a hearing on June 29, 2010.  (Tr. 127-28). On May 10, 2011, October 19, 2011, and February 7, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert appeared and testified. (Tr. 23-109).  On February 23, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-21). On April 28, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7), which the Appeals Council denied on July 2, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On August 26, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 4, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On December 19, 2013, Plaintiff filed a brief in support of her appeal. ("Pl. Brief") (Doc. 10). On February 23, 2014, Defendant filed a brief in response. ("Def. Brief") (Doc. 11). On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned Magistrate Judge on July 21, 2014,

and an order referring the case to the undersigned Magistrate Judge for adjudication was entered on August 1, 2014. (Doc. 14, 16).

## III.   Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate," then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on January 14, 1990 and was classified by the regulations as a

"younger individual" through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 34).   She has at least a high school education and past relevant work as a laborer, stores, fast food worker, and sales attendant. (Tr. 19, 41).

## Work Records

The Plaintiff is asserting that her back pain and mental impairments were disabling during a relevant period from her amended alleged onset date of January 1, 2010 (Tr. 94) to the decision date on February 23, 2012. During the entire relevant period, however, she was either earning wages by working, sometimes up to almost sixty hours per week, or certifying that she was "able to work" in order to receive unemployment. She earned a total of $8,317.34 from wages in 2010 and, as of October 19, 2011, earned a total of $5,792.00 (Tr. 301). She also received $1,410 in unemployment in the first quarter of 2010, $280.00 in unemployment in both the second and third quarters of 2010, $2,443.00 in unemployment in the first quarter of 2011, $825.00 in unemployment in the second quarter of 2011, and $599.00 in unemployment in the third quarter of 2011. (Tr. 294-95). She certified every two weeks while she received unemployment that she was "able to work." (Tr. 38). She testified that, while she was receiving unemployment and certifying that she was able to work, she was capable of performing "light duty" jobs, like a receptionist. (Tr. 38). She continued receiving unemployment until she received a letter at the beginning of October that her benefits were "exhausted." (Tr. 37). By October 11, 2011, Plaintiff had secured her next job as a photographer. (Tr. 53).

Specifically, Plaintiff reported on her work history report that she stopped working for Rudder's farm on January 25, 2010. (Tr. 93). She received unemployment in the second and third quarters of 2010. (Tr. 294-95).  She worked at Arby's in August of 2010. (Tr. 362). She

worked at Carlisle Hotels for eight months, from August 2010 to April 2011. (Tr. 362). She reported that she worked at Wendy's from September 2010 to November 2010 but started working at Amazon from November 2010 to March 2011 because Amazon paid better. (Tr. 51, 293, 362). She was still working at Carlisle Hotels. (Tr. 51, 293-94).

Plaintiff indicated that, at Amazon, she was driving an order picker, picking up customer orders, pushing boxes off a belt onto trucks, applying shipping labels, and lifting up to twelve pounds. (Tr. 361). However, Plaintiff testified at the hearing that she never lifted ten pounds or more. (Tr. 48). An earnings report from Amazon shows that Plaintiff was frequently able to work more than forty hours per week. (Tr. 307). For instance, during the week of December 5, 2010, she worked fifty hours. (Tr. 307). She earned overtime the next two consecutive weeks, working 57.6 hours the week of December 12, 2010 and 44.25 hours the week of December 19, 2010. (Tr. 307). She worked 41.75 hours the week of January 21, 2011, and then earned overtime hours for five consecutive weeks in February and March of 2011 (42.35 hours the week of February 6, 2011, 45.5 hours the week of February 13, 2011, 48.25 hours the week of February 20, 2011, 42.25 hours the week of February 27, 2011, and 40.25 hours the week of March 6, 2011). (Tr. 308). At the hearing on October 19, 2011, she did not testify to any problems while working at Amazon, and she explained that she stopped working there because she was laid off. (Tr. 48).

Plaintiff also began working as a photographer on October 11, 2011. (Tr. 53). While working as a photographer, Plaintiff worked for Amazon again in November and December of 2011, including another week of overtime the week of November 13, 2011. (Tr. 308).  However, Plaintiff failed to mention her recent work with Amazon at the hearing on February 7, 2012, and testified that she had quit her job at Amazon in March of 2011 because she could not "stand

working all those hours." (Tr. 94). She was working as a photographer less than twenty hours a week at the time of the hearing on October 19, 2011, but by the time of the hearing on February 7, 2012, she testified that she was working three days and twenty hours a week. (Tr. 54, 91).

### Medical Records

Plaintiff was treated at the Stevens Center for mental health issues from 2005 to 2007, when she was between the ages of 15 and 17. (Tr. 385-435). She was diagnosed at various times with Major Depressive Disorder, Panic Disorder with agoraphobia, Bipolar Disorder, impulse control disorder, not otherwise specified, ADHD, and polysubstance abuse. (Tr. 391, 401, 405, 409, 426). She reported current use of marijuana and cocaine along with past use of codeine, crack cocaine, alcohol, ecstasy, and Vicodin. (Tr. 421). She indicated that she was involved in the criminal justice system and on probation due to fighting at school. (Tr. 425, 433). Her medications included Lexapro, Abilify, Strattera, Depakote, Effexor, Seroquel, Zoloft, Trazadone, and Paxil. (Tr. 387-89). Plaintiff went to rehab three times. (Tr. 65, 964).

On June 21, 2008, shortly after Plaintiff graduated high school, x-rays of Plaintiff's lumbar spine indicated grade 1 spondylolisthesis at L5-S1. (Tr. 486, 771). Compared to a report from 2006, the spondylolisthesis had increased. (Tr. 771). There was "also spina bifida occulta at the L6 level." (Tr. 771). Plaintiff reported that her back had been bothering her for about seven months since her friend stood on her back and tried to crack it. (Tr. 760). She was prescribed physical therapy two to three times per week. (Tr. 760). On August 7, 2008, Plaintiff was evaluated for low back pain and pain in her right hip by David Black, PA-C and Dr. Timothy Reiter, M.D. (Tr. 487). She had a negative straight leg raise, normal strength and gait, and no

muscle spasm, although her lumbar spine was tender to palpation. (Tr. 488). He prescribed her Vicodin and Flexeril and told her to continue with physical therapy. (Tr. 488).

On September 8, 2008, Plaintiff followed up with Mr. Black and Dr. Jonas Sheelan, M.D. (Tr. 484). A CT scan indicated Grade I anterolisthesis of L5 on S1 with bilateral L5 pars defects and evidence of spina bifida occulata, along with asymmetry that "possibly represent[ed] a conjoint nerve root, a nerve root cyst, and much less likely a disc herniation." (Tr. 482, 484-85). They referred her to pain management recommended lumbar epidural steroid injections, opining that surgery would not "significantly improve her current pain." (Tr. 482). On September 11, 2008, an MRI of the lumbar spine was normal except for "grade 1 spondylolisthesis at L5-S1" that was not causing spinal stenosis or neural foramen narrowing. (Tr. 769).

On October 8, 2008, Plaintiff's physical therapist, Tara L. Brenner, MPT, provided a recommendation to Plaintiff's employers that she be "allowed to sit periodically throughout her workshift to allow for the decompression of spinal segments." (Tr. 735).

On October 16, 2008, Plaintiff was evaluated in the pain management clinic by Dr. David Giampetro. (Tr. 481). She reported that she was "able to do activities of daily living such as dressing, taking a shower, doing light household chores" and that she "has managed to keep her job at a convenient store where she is employed making sandwiches." (Tr. 479). Walking made her unsteady and she had a positive facet loading test, but she had normal strength and her straight leg raising test was negative bilaterally. (Tr. 480). She was prescribed pain medication, referred to Orthotics for a brace, and scheduled for an injection of her bilateral facet joint area. (Tr. 480). Plaintiff had the injection on October 31, 2008 and tolerated the procedure well, but her pain allegedly remained unchanged. (Tr. 478).

However, Plaintiff did not mention back pain again until almost a year later, on October 2, 2009, the same date she protectively applied for SSI. (Tr. 309). The week after her October 31, 2008, injection, she stopped showing up for physical therapy appointments. (Tr. 736). On January 19, 2009, Plaintiff was discharged from physical therapy because she "failed to show up for last 3 P.T. visits, has not scheduled additional visits or been in contact with this facility such that it is presumed that patient has no intention of additional P.T. intervention at present." (Tr. 736). She had last shown up on November 3, 2008. (Tr. 736). On January 28, 2009, Plaintiff reported that she had injured her neck while "doing a back flip." (Tr. 522). Plaintiff was treated over the next nine months for various illnesses at Three Springs, for fever at Holy Spirit Hospital, and for a laparoscopy and subsequent complications at Hershey Medical Center and never mentioned back pain. (Tr. 438-42, 444, 453-463, 467-68, 471, 512-534). Hospital notes on September 13, 2009 indicate that, aside from the complications from the diagnostic laparoscopy, she was a "19-year old otherwise healthy female." (Tr. 455). She had "no other complaints or concerns at this time." (Tr. 457).

On October 2, 2009, Plaintiff filed for SSI. (Tr. 309). The same day, she followed up with Dr. Sheehan and Mr. Black, and complained of back pain. (Tr. 449). An x-ray of Plaintiff's lumbar spine indicated bilateral pars interarticularis defects at L5 with grade 1 spondylolisthesis and moderate lower lumbar facet arthrosis. (Tr. 448). Although Plaintiff had stopped showing up for her physical therapy appointments the week after receiving an epidural injection, she reported to them that her injection only increased her pain and that she had completed physical therapy in a "6-8 month" course without helping her symptoms. (Tr. 449). Although Plaintiff had never mentioned back to her providers at Three Springs, she stated that they were refusing to treat her

back pain because it was "out of their hands since she had been referred up here." (Tr. 449). They ordered additional imaging and referred Plaintiff to the Ortho Spine Department and Pain Management Department. (Tr. 449).  At this time, Plaintiff was still working at Rudder's Farm. (Tr. 286). She was earning between $1,600.00 and $1,800.00 in wages per month. (Tr. 272). At Rudder's Farm, she had to walk or stand eight hours a day, lifted up to twenty pounds, was "constantly running around," and was responsible for training other employees. (Tr. 331). She continued working there until January of 2010. (Tr. 331).

On October 6, 2009, Plaintiff had a "normal postop exam" on follow-up from her laparoscopy. (Tr. 446, 812). She reported that she had been doing fairly well as an outpatient for her colitis and that her pain was waxing and waning. (Tr. 446). She had minimal abdominal pain on examination. (Tr. 446).  She did not report back pain.

On October 9, 2009, Plaintiff was seen at Three Springs Family Practice and complained of pain "all over" from her neck down to her legs. (Tr. 640, 893, 494). She had muscle spasm. (Tr. 494). She walked with a normal gait for her age. (Tr. 893). The same day, she was seen in the Pain Clinic by Dr. Giampetro. (Tr. 875). She stated that she had increasing pain with numbness and tingling radiating to her legs over the last four weeks. (Tr. 875). She had tenderness to palpation with paraspinal hypertonicity, was somewhat limited in her ability to flex and extend, but was neurovascularly intact, had normal strength, and had a negative straight leg raise. (Tr. 875). He assessed her to have lumbar spondylolisthesis, spina bifida occulata, somatic dysfunction, leg length discrepancy, lumbar spasm, and pelvic pain. (Tr. 876). He recommended that she take over the counter Aleve, prescribed her Lidoderm cream, Flexeril, and Meloxicam, and referred her to physical therapy and a psychotherapy evaluation. (Tr. 876). On October 22,

2009, an MRI of her lumbar spine. indicated that Plaintiff had "[m]ild grade 1 spondylolisthesis of L5 on S1 with associated bilateral L5 spondylolysis" and "moderate left L5-S1 foraminal stenosis," along with conjoined right S1 and S2 nerve roots. (Tr. 874).

On November 2, 2009, Dr. Knaub completed a return to work note that retroactively excused Plaintiff from work from October 19, 2009 to November 2, 2009. (Tr. 637). It indicated that she could return to work on November 2, 2009 "without restrictions." (Tr. 637).

On January 23, 2010, Plaintiff was involved in a head-on car accident and reported back pain. (Tr. 910). She indicated that she was taking Flexeril as needed for back pain. (Tr. 910). X-rays of the lumbar spine showed no change from June 21, 2008. (Tr. 690).

On January 26, 2010, Plaintiff saw Dr. Ronald Vandegriff, D.O., for a consultative examination. (Tr. 569). She was still working for Rudder's. (Tr. 570). She was taking only Flexeril at night for her back pain. (Tr. 571). She was able to ambulate to and from the exam room and get on and off the exam table, except that she had to use a step stool. (Tr. 571-72). She moved all extremities without difficulty. (Tr. 572). Her neurological exam was normal. (Tr. 572). Her range of motion was normal except for decreased flexion and extension in the lumbar region. (Tr. 578). He opined that she could frequently lift up to ten pounds and occasionally lift twenty pounds. (Tr. 575). He indicated that she had no limitation in standing, walking, sitting, pushing, pulling. (Tr. 575). However, he opined that she could only occasionally bend, kneel, and stoop and could never crouch, balance, and climb. (Tr. 576).

On February 18, 2010, Dr. Giampetro evaluated Plaintiff. (Tr. 915). He noted she had normal strength, negative straight leg raise, normal reflexes and was in no acute distress, although she had tenderness in her lumbar spine. (Tr. 914-15). She was observed to have a flat

affect and was somewhat drowsy. (Tr. 914). She denied depression but admitted to occasional tearfulness. (Tr. 914). Notes indicate that, "at the end of the interview, the [Plaintiff] said she has got to have something for pain and requests narcotics…[and] referred to the provider as 'dude.'" (Tr. 914). However, notes indicate that he did not feel she was a "candidate for opiods." (Tr. 915). He noted that Plaintiff refused psychotherapy. (Tr. 914-15).

Dr. Christopher Royer evaluated Plaintiff's mental health on April 29, 2010. (Tr. 581-586). Plaintiff stated that she had never used alcohol or illicit drugs. (Tr. 582). Plaintiff also reported "that she was accused of being under the influence [at work], when she denies having used any substance at all." (Tr. 582). She stated that she had never had any legal problems, past or present. (Tr. 582). Plaintiff reported that she has unpredictable mood swings but did not take medications anymore because she gained weight. (Tr. 581-82). She reported that she "gets in trouble sometimes" because she will not "take stuff from people." (Tr. 582). She also reported having panic attacks while driving at night. (Tr. 582). She reported that she has periods of depression where she is tearful and withdrawn from everyone. (Tr. 582). Plaintiff reported leaving one job because of problems with her manager and violence in romantic relationships, but indicated that living with her grandparents "goes ok." (Tr. 582).

Dr. Royer observed that Plaintiff was pleasant, cooperative, and her judgment was "fair" overall. (Tr. 583). She performed in the mildly impaired range on a test of mental arithmetic but she was "able to comprehend and follow all test instructions." (Tr. 583). Her affect was mildly tense. (Tr. 583). Dr. Royer diagnosed her on Axis I with Bipolar II Disorder and on Axis II as having borderline features. (Tr. 583). He assigned her a GAF of 55. (Tr. 584). He opined that Plaintiff had moderate problems interacting appropriately with supervisors and responding

appropriately to work pressures in usual work settings, marked problems in interacting appropriately with co-workers and responding appropriately to changes in a routine work settings, and an extreme limitation in interacting with the public. (Tr. 585). He based this opinion on Plaintiff's mood swings, impulsivity, and her reported history of violence with boyfriends. (Tr. 585). He opined that substance abuse did not contribute to any limitations. (Tr. 586).

On May 12, 2010 and May 19, 2010, Plaintiff was seen at Three Springs Family Practice for abdominal pain. (Tr. 919, 922). At both visits, she stated that her general health was "fair" and she "denie[d] musculoskeletal symptoms." (Tr. 919, 922). At both visits, she walked with a normal gait, did not mention back pain, and back pain was not listed as one of her medical problems. (Tr. 919-920, 922-23). On May 19, 2010, she was noted to be "[a]lert and oriented. Memory is intact. Pleasant, good fund of knowledge about previous treatments. Cooperative." (Tr. 923).

On May 21, 2010, Elizabeth Hoffman, Ph.D., a state agency psychologist, completed a mental RFC assessment based on Plaintiff's medical records and other evidence in the file. (Tr. 588). She noted that Plaintiff had received outpatient therapy in the past but was not on any psychotropic medication. (Tr. 589). She noted that Plaintiff "may have difficulty interacting with the public, coworkers, supervisors and responding to changes and pressures in the work setting," but considered Dr. Royer's opinion to be overstated in the areas of social function and adaption because they were not supported by the medical evidence and because a consultative exam is only a snapshot of Plaintiff's functioning. (Tr. 589). She also noted that Dr. Royer observed her to be pleasant and cooperative and had no limitations in understanding, coherency, or concentration. (Tr. 589). Dr. Hoffman also considered Plaintiff's activities, noting that she "she

is independent in personal care. She can cook, clean, shop and manage money. She can drive but does not like to go alone because she says she gets paranoid." (Tr. 589). She opined that Plaintiff had only moderate limitations in social functioning and adaptation. (Tr. 588, 601).

On August 26, 2010, Plaintiff followed-up with Dr. Giampetro. (Tr. 618-20, 856). She reported that she was doing "relatively well with her current regimen," and rated her pain as a five out of a ten point scale. (Tr. 855). Plaintiff had resumed working. (Tr. 857). She requested a pain reliever she could take while working that would not sedate her. (Tr. 855). She ambulated with no obvious discomfort but had tenderness in the sacroiliac joints. (Tr. 855). She was "alert and appropriate," with no "obvious deficits in speech or cognitive function," but her affect was "somewhat flat and withdrawn." (Tr. 855). She was discharged to Three Springs for care of her back pain because she did not need to drive "all the way up here for these medications." (Tr. 865). She was to follow-up at the pain clinic only as-needed. (Tr. 856).

Plaintiff was treated at Three Springs on July 9, 2010, July 15, 2010, July 28, 2010, August 16, 2010, October 26, 2010, November 16, 2010, January 3, 2011 and March 10, 2011. (Tr. 924, 926-27, 929-32, 935, 937 940). She denied depression, anxiety, and neurological symptoms, and she described her health as "good" or fair" at most visits, with the exception of July 9, 2010, and July 15, 2010. (Id.). On July 9, 2010, reported that she had been "jumped by the mother of her boyfriend's baby and her posse" and fractured her finger but that Plaintiff was "the one charged with disorderly conduct." (Id.). On July 15, 2010, her knee hurt and she was "slightly limping" after falling down the stairs at the courthouse. (Id.). She never mentioned back pain or other musculoskeletal symptoms at any of these visits. (Id.). Plaintiff followed-up with

Dr. Lee on August 26, 2010 and January 27, 2011, never mentioned back pain, appeared "healthy," and walked with a normal gait. (Tr. 608-09, 622, 845-46, 858, 942, 945-46).

On February 8, 2011, Plaintiff was evaluated at the Pain Clinic. (Tr. 606, 843). She reported that she had a "full time job and working 40 hours per week." (Tr. 843).  She denied numbness or tingling in her lower extremities. (Tr. 606). She ambulated with no obvious discomfort, denied numbness or tingling in her lower extremities, and her straight leg raise was negative, but she had tenderness and FABER testing was positive. (Tr. 843). Her left leg was shorter than her right, but Plaintiff did not pursue the option to see a physiatrist. (Tr. 843). Her mood and affect were "somewhat flat and withdrawn." (Tr. 843). She reported that her Ultram medication provided her with "some pain relief" and that when she visited the emergency room and had Percocet, it "relieved her pain." (Tr. 843). She was requesting more Percocet. (Tr. 843). However, Plaintiff was "counseled regarding opiod use given her age and the potential for addiction." (Tr. 844). Notes indicated that they "would like the primary care physician to take over the management of Ultram" and would see her back only on an as-needed basis. (Tr. 844).

On March 8, 2011, Plaintiff had an enteroscopy. (Tr. 825). Notes indicated her "spina bifida and scoliosis [were] causing chronic pain, but otherwise active employment." (Tr. 836).

Plaintiff was seen at Three Springs on April 11, 2011, May 3, 2011 and July 22, 2011. (Tr. 952, 955, 958-59). She never mentioned back pain and walked with a normal gait. (Id.).[1]

On August 1, 2011, Dr. Christopher Royer performed another consultative examination of Plaintiff to evaluate her mental RFC. (Tr. 879-882). Her judgment appeared to be borderline and she had mildly pressured speech, but no perceptual disturbances or other gross

---

[1] Although Plaintiff has repeatedly claimed that she has not had a drink since she was seventeen, she reported to Three Springs Family Practice on April 11, 2011 that she believed her "drink had been drugged." (Tr. 952).

psychopathology were reported or observed. (Tr. 880). "She was able to comprehend and follow all test instructions" but her reasoning by analogy was impaired and she had difficulty with abstract conceptualization. (Tr. 880). Her affect was "somewhat tense and dysphoric" and she was mildly labile, tearful at times.  (Tr. 880, 882). She never disclosed her full-time employment with Amazon. Dr. Royer diagnosed her with Bipolar II Disorder, Borderline Personality Disorder, and assessed her to have a GAF of 48. (Tr. 882).

Plaintiff was seen at Three Springs on August 2, 2011 and September 15, 2011. (Tr. 963-966). She never mentioned back pain and back pain was not listed as a medical problem. (Tr. 963). On September 15, 2011, she specifically "denie[d] musculoskeletal symptoms." (Tr. 966).

On October 20, 2011, the day after her second hearing, Plaintiff saw Dr. David C. Baker for a follow-up evaluation of her back. (Tr. 970). She had an MRI that showed Grade 1 spondylolisthesis at L5-S1 secondary to spondylolysis and that her foraminal stenosis had increased compared to her previous MRI. (Tr. 970). Plaintiff explained that surgeons had told her in the past that she was ineligible for surgery because she did not have leg pain. Although Plaintiff had only mentioned leg pain once, in a visit to Dr. Giampetro two years earlier (except when she bruised her knee falling down the courthouse stairs), she told Dr. Baker that she had persistent leg pain over the last year. (Tr. 970). As a result, Dr. Baker referred her to a surgeon and explained that she "might" be a candidate for surgery. (Tr. 970). Dr. Baker noted that:

> [Plaintiff] did ask about disability and states that she is applying. I told her that in my opinion, this is not a permanently disabling condition and that she should be able to return to work after this surgery. She might need a year of temporary full and then partial disability but I would not support total permanent at this time. I stressed that this surgery should allow pretty good function for many jobs.

(Tr. 971).

On November 21, 2011, Dr. Bruce Goodman performed an orthopedic evaluation on Plaintiff. (Tr. 979). He also reviewed the medical records in Plaintiff's file. (Tr. 977).  He noted that, at the time of her pain management visit in February of 2011, she was working forty hours a week at a full-time job. (Tr. 977). He reviewed her activities of daily living, and noted that she could drive and did some light cleaning, but no grocery shopping. (Tr. 978). He noted that she was working one day a week as a photographer. (Tr. 978). He observed Plaintiff to be alert, cooperative, and articulate. (Tr. 977). He conducted a physical exam, where he noted that "[i]mperceptible touching of the skin the low back area elicits severe discomfort." (Tr. 978). She had decreased range of motion. (Tr. 978). She "resist[ed] straight leg raising" on the left and had normal straight leg raising on the right. (Tr. 978). She had no paravertebral muscle spasm. (Tr. 978). She was "capable of getting off the examining table without assistance although apparently with discomfort." (Tr. 979). He opined that she could lift ten pounds frequently and twenty pounds occasionally. (Tr. 981). He opined that she could sit, stand, and walk for a cumulative eight hours in an eight hour work day with a sit/stand option. (Tr. 981). He opined that she could never stoop, crouch, balance, or climb and could only occasionally bend or kneel. (Tr. 982).

On January 20, 2012, Dr. Royer completed a medical source statement. (Tr. 972).  He opined that she had marked limitations (defined as a "serious limitation in her ability to function" on the form) in her ability to interact with the public and co-workers. He opined that she had extreme limitations (defined as "no ability to function" on the form)  in her ability to interact with supervisors or to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 973). He based these limitations on her "substantial and insidious difficulties [with] social skills and relationships. Significant generalized psychiatric disturbance." (Tr. 973).

**Function Reports, Testimony, and Findings**

Plaintiff and her grandmother completed function reports in November and December of 2009.  Both reported that she had no problem with personal care and cooks meals, cleans, and does laundry daily. (Tr. 323-24, 339-40). Both reported that she goes outside daily and travels by walking, driving, and riding in a car. (Tr. 325, 341). Both indicated that she can shop for clothes, food, medical supplies, and hygiene products for up to two hours. (Id.). Her grandmother indicated that Plaintiff can travel alone, but Plaintiff indicated that she does not like to because she feels unprotected. (Id.). Her grandmother noted that Plaintiff socializes with friends and relatives every day, and Plaintiff specified that she likes to hang out with people, go out to dinner, watch television, and go on walks. (Tr. 326, 342). Both indicated that she has problems handling stress and getting along with people because of mood swings. (Tr. 326-28, 342-43).

Plaintiff indicated she had no problems with reaching, kneeling, climbing stairs, memory, completing tasks, concentration, understanding, following instructions, or getting along with others. (Tr. 343). She indicated that bending, standing, walking long distances, and long car rides exacerbates her pain. (Tr. 346). She reported that she can walk a full mile without needing to stop or rest. (Tr. 343). Her grandmother stated that Plaintiff can "finish what she starts," but Plaintiff reported that she can only pay attention for ten minutes at a time. (Tr. 327, 343). When asked how she gets along with authority figures, she wrote "I hate cops but I do what I have to keep things cool, calm, [and] collected." (Tr. 344).

At the hearing on October 19, 2011, Plaintiff testified that she had "constant back pain." (Tr. 66). Plaintiff explained, although her doctors had stressed to her that she needed to go to psychotherapy, she refused to go because she did not want to be put on medications that would

make her gain weight. (Tr. 67). At the hearing on February 7, 2012, the ALJ asked whether Plaintiff had received any mental health treatment in the interim. (Tr. 95). Plaintiff's attorney responded that she "has gone through that in the past and does not want to go back on any kind of medication for that." (Tr. 95). When asked about counseling, which would not require medication, her attorney responded that she was "just not [going] though with that. I think we're primarily looking at this as a physical disability that's rendering her unable to work. There appear to be some issues with getting along with co-workers or supervisors, but the major disabling impairment is the back and physical reasons." (Tr. 95). The vocational expert testified that an individual with Plaintiff's RFC, as described below, could not perform any of Plaintiff's past relevant work but could perform work in the national economy, specifically a parking lot cashier, DOT code 211.262-010, machine tender, DOT code 556.685-038, and a potato chip sorter, DOT code 526.687-010. (Tr. 105-106).

At step one, the ALJ found that Plaintiff was insured through June 30, 2010, and has not engaged in substantial gainful activity since September 30, 2009, the alleged onset date. (Tr. 13, Finding 1-2). At step two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine, spina bifida occulta, chondromalacia of the patella of the left knee, Bipolar II Disorder, and Borderline Personality Disorder were medically determinable and severe impairments. (Tr. 13, Finding 3). The ALJ found that Plaintiff's polycystic ovarian disease, internal hemorrhoids, history of colitis and drug abuse were medically determinable, but not severe, because there was "no evidence of record indicating that any of these impairments have more than a minimal effect on the [Plaintiff's] ability to perform basic work activities." (Tr. 13-14, Finding 3). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of a listed impairment. (Tr. 14-15, Finding 4). The ALJ found that Plaintiff had the RFC to perform a range of light work that allows for additional breaks of a few minutes duration during the early and later parts of the work shirt to change position or have a restroom break and a sit/stand option, limited to only occasional use of foot/leg pedals, climbing stairs, stooping, kneeling, crouching, or squatting, reaching overhead bilaterally, exposure to extreme cold, and interacting with the general public. She can never climb rope, ladders, scaffolds, or poles, crawl, work in high exposed places or around fast moving machinery on the ground. (Tr. 16, Finding 5). Based on this RFC and the VE's testimony, the ALJ found that Plaintiff cannot perform any past relevant work but can perform the work in the national economy identified by the VE. (Tr. 19-21, Findings 6-10). As a result, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 21).

### VI.      Plaintiff Allegations of Error

### A.      The ALJ's credibility determination

Plaintiff testified that she was in constant back pain and had reported problems with social interactions as a result of her mental impairments, but the ALJ found that these claims were not fully credible. Plaintiff asserts that this is an error because "once a claimant has submitted sufficient evidence to support symptoms, the Administrative Law Judge may not dismiss the evidence as simply not credible without pointing to contrary medical evidence." (Pl. Brief at 11) (citing Williams v. Sullivan, 970 F.2d 1178, 1184-5 (3rd Cir. 1992)).

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

[T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; See also 20 C.F.R. § 416.929 ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence.").

"One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P

The Third Circuit has explained:

An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749 F.2d at 1071. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *Carter,* 834 F.2d at 65; *Ferguson,* 765 F.2d at 37.

Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993). Thus, contrary medical evidence is only required when the medical evidence supports Plaintiff's complaints of pain, not the medically determinable impairment that could reasonably be expected to produce pain. When medical evidence supports only the underlying impairment, and not the subjective symptoms, an ALJ only needs to provide "serious consideration" to the claimant's complaints. Subsequent Third Circuit cases held that a claimant's credibility can be discounted where sustained activities of daily living contradict the claimant's subjective complaints. Horodenski v. Comm'r of Soc. Sec., 215 F. App'x 183, 189 (3d Cir. 2007) (Rejecting Plaintiff's credibility without pointing to

contradictory medical evidence and noting that "we disagree that housework and child care - which Horodenski claimed to have been performing daily - constitute 'sporadic and transitory activities.'"); See also Wright v. Sullivan, 900 F.2d 675, 681 (3d Cir. 1990).

Here, the ALJ noted that Plaintiff admitted she worked part-time after her amended alleged onset date and engages in various activities of daily living, such as shopping for up to two hours and doing household chores, and concluded that these activities contradict Plaintiff's claims that her back pain and leg numbness is constant. (Tr. 17). With regard to social functioning, the ALJ noted that Plaintiff admitted she interacts with others, including family members and friends, on a regular basis. (Tr. 17).

The ALJ properly characterized the evidence. Plaintiff either worked or certified that she able to work throughout the entire relevant period. She sometimes worked up to sixty hours a week. (Tr. 38, 53, 293-95, 301, 307-08, 362). In the midst of five consecutive weeks of overtime, notes from a March 8, 2011 visit to Hershey Medical Center indicate that Plaintiff's "spina bifida and scoliosis [were] causing chronic pain, but otherwise active employment." (Tr. 836). Although she did not work enough to deny her claim at step one, her ability to work this much certainly undermines her claims that she is disabled because of "constant" back pain. SSR 96-7p (The adjudicator must consider "prior work record and efforts to work" and "daily activities" in making a credibility determination). Her certification that she was able to work, and subsequent receipt of unemployment benefits on the basis of that certification, also undermines her credibility. Additionally, both Plaintiff and her grandmother reported that Plaintiff could shop for up to two hours, prepare meals and clean on a daily basis, travels by walking, driving, and riding in a car, can walk up to a mile before needing to rest, goes out to dinner, watches television, and

has no problem with personal care. (Tr. 322-328, 338-344). She also indicated that she had no problems with reaching, kneeling, or climbing stairs. (Tr. 343). These undermine Plaintiff's claim that her back pain renders her unable to perform a limited range of light jobs, like sorting potato chips. With regard to social functioning, both Plaintiff and her grandmother reported that she socializes with relatives and friends almost every day, likes to "hang out" with people, and has only minimal problems with following instructions. These undermine Plaintiff's claim that she had either a "substantial loss in her ability to function" (marked limitation) or "no ability to function" (extreme limitation) when it comes to interacting with co-workers and supervisors.

Moreover, the ALJ *did* identify contradictory medical evidence. With regard to Plaintiff's claim that she has constant back pain and leg numbness, the ALJ wrote that Plaintiff's "medical records indicate that she denied experiencing any musculoskeletal or neurological symptoms on multiple occasions and denied experienc[ing] numbness in her lower extremities." (Tr. 17). The ALJ cited to Plaintiff's "negative straight leg raising tests during multiple physical examinations" and numerous medical records indicating that Plaintiff had a normal gait. (Tr. 17). The ALJ cited to medical evidence that Plaintiff does not need an assistive device to ambulate, was observed to have no difficulty ambulating to and from the examination room, and was observed to ambulate normally with no obvious discomfort. (Tr. 17). The ALJ relied on medical evidence that Plaintiff had normal strength in her lower extremities. (Tr. 17). With regard to social functioning, the ALJ cited to medical records showing that Plaintiff had engaged in only very conservative treatment for her mental impairments. (Tr. 18). SSR 96-7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following

the treatment as prescribed and there are no good reasons for this failure.") The ALJ also cited to medical evidence that Plaintiff was engaging in drug-seeking behavior, which "reflects poorly upon [Plaintiff's] credibility as a whole." (Tr. 17).

The ALJ properly characterized this medical evidence. A month before the October 19, 2011 hearing in which she claimed her back pain was "constant," (Tr. 66), she was seen at Three Springs on September 15, 2011 and specifically denied musculoskeletal symptoms. (Tr. 967). At her pain management visit on February 8, 2011, Plaintiff reported that she had a "full time job and [was] working 40 hours per week" and denied having numbness or tingling in her lower extremities. (Tr. 606, 843).   At visits to Three Springs on May 12, 2010 and May 19, 2010, Plaintiff specifically denied having any musculoskeletal symptoms. (Tr. 919, 922). The medical record indicates that Plaintiff "resist[ed] straight leg raising" on the left and had normal straight leg raising on the right at her November 21, 2011 consultative evaluation with Dr. Goodman. (Tr. 978). Plaintiff walked with a normal gait on September 15, 2011 (Tr. 967), July 22, 2011 (Tr. 959), April 11, 2011 (Tr. 952), and March 10, 2011 (Tr. 947).   She had a negative straight leg raise on February 8, 2011 and ambulated without obvious discomfort. (Tr. 843). Dr. Lee noted that she walked with a normal gait on January 27, 2011 (Tr. 943). Plaintiff walked with a normal gait on December 11, 2009, April 2, 2010, May 12, 2010, May 19, 2010, July 9, 2010 and July 28, 2010. (Tr. 901, 917, 919, 922, 924, 931). Plaintiff was released to work on "without restrictions" on November 2, 2009, shortly before her amended alleged onset date. (Tr. 637). The only time Plaintiff walked with an abnormal gait was when she was "slightly limping" after falling down the stairs at the courthouse and bruising her knee on July 15, 2010. (Tr. 927). Even after Plaintiff got into a fight with a group of people, she did not mention back pain and walked

with a normal gait. (Tr. 924). The ALJ correctly noted that Plaintiff always had normal strength in her lower extremities during the relevant period. (Tr. 480, 488, 875, 914-15).

Except for the records from February 8, 2011 and November 21, 2011, Plaintiff never mentioned back pain at any of the above-described appointments. Plaintiff was discharged to Three Springs from the Pain Clinic on August 26, 2010 for management of her back pain because she had resumed working, only needed a refill for medications, and it was not necessary for her to drive "all the way up here for these medications." (Tr. 865). However, Plaintiff never mentioned back pain in subsequent visits to Three Springs or with Dr. Lee. (Tr. 608-09, 845-46, 937-38, 945-46).  Plaintiff was seen at the Pain Clinic again on February 8, 2011, but she refused to undergo psychotherapy and was discharged again to Three Springs for management of her pain. (Tr. 844). Plaintiff never mentioned back pain in any of six subsequent appointments at Three Springs. (Tr. 947, 952, 955, 959, 963, 966). Plaintiff was apparently seen by Dr. Baker twice during this period for back pain, (Tr. 73). However, the issue is not whether Plaintiff ever had back pain, it is whether her claims that her back pain was "constant" and disabling were credible. The medical records identified above show that it was not. Thus, the ALJ complied with <u>Williams</u> by citing to contradictory medical evidence and activities that were neither sporadic nor transitory and properly discounted Plaintiff's claims.

## B.      The ALJ's evaluation of Dr. Baker's opinion

Dr. Baker opined that Plaintiff was not permanently disabled, but "might" need surgery and, if the surgery was performed, "might" need temporary disability. The ALJ gave significant weight to Dr. Baker's opinion that Plaintiff's back impairment was not permanently disabling, but assigned little weight to his opinion that she "might" need surgery and "might" need

temporary disability as speculative and on an issue reserved to the Commissioner. (Tr. 18).

However, Plaintiff asserts that Dr. Baker's opinion was entitled to controlling weight, that the

ALJ may not "pick and choose" parts of a treating physician's opinion, and that the ALJ was

substituting her own medical opinion for that of a physician.

Specifically, Plaintiff argues that:

The Administrative Law Judge is obligated to give controlling weight to a treating
physician's opinion that is well supported by clinical and diagnostic techniques. 20 CFR
§404.1527, 416.927. Dr. Baker's opinion is supported by the Plaintiff's CT Scan (Tr. Pg.
482), MRI (Tr. Pg. 638) and X-rays (Tr. Pg. 690).

(Pl. Brief at 7). Plaintiff misstates the rule. An ALJ must only give controlling weight when a

treating source's opinion is both well-supported "and is not inconsistent with the other

substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2)(emphasis added). As

discussed above, any opinion that Plaintiff was disabled was contradicted by medical evidence.

Plaintiff cites Wallace v. Sec. HHS, 722 F.2d 1150, 1154 (3rd Cir. 1983) for the

proposition that an ALJ may not assign different weights to different aspects of an opinion. (Pl.

Brief at 6). In Wallace, a psychiatrist opined that the claimant was "not capable of gainful

employment" at the present time and had to be viewed as "temporarily unemployable." Id. at

1154. However, the ALJ relied on this opinion to find that Plaintiff was employable, based on a

"one-line notation that [the psychiatrist] found [claimant] 30% disabled due to psychiatric

impairment," without acknowledging rest of the opinion. Id. at 1156, n. 7. The Third Circuit

reversed on the ground that the ALJ had mischaracterized the opinion as a whole based on the

one-line notation. Thus, Wallace does not stand for the proposition that an ALJ may not assign

different levels of weight to different portions of a medical source opinion. Even where an

opinion is given great weight, the ALJ is not required to fully credit every part of the opinion.

<u>Lee v. Comm'r Soc. Sec.</u>, 248 F. App'x 458, 461 (3d Cir. 2007)(Upholding the findings of the ALJ where the ALJ had afforded "great weight" to the opinions of treating physicians, but did not "fully credit" them where there were treatment gaps in their records that undermined Plaintiff's claimed severity); <u>Carter v. Comm'r of Soc. Sec.</u>, 511 F. App'x 204, 205-06 (3d Cir. 2013) (Upholding the findings of the ALJ where the ALJ afforded treating physician "great weight" but discounted statement that claimant was unable to work).

Additionally, the ALJ properly noted that Dr. Baker's opinion on disability need not be credited because it addresses an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Plaintiff does not challenge this assertion. Plaintiff also does not address the fact that Dr. Baker only opined that Plaintiff "might" need surgery and "might" need temporary disability. The ALJ properly described this opinion as speculative. Thus, there is no merit to this allegation of error.

### C.      The ALJ's evaluation of Dr. Royer's opinion

Dr. Royer opined on April 29, 2010 that Plaintiff had marked problems in interacting appropriately with co-workers and responding appropriately to changes in a routine work setting, and an extreme limitation in interacting with the public. (Tr. 585). He based this opinion on Plaintiff's mood swings, impulsivity, and her reported history of violence with boyfriends. (Tr. 585). On January 20, 2012, he completed another statement, this time opining that she had she had a marked limitation, defined as a "serious limitation in her ability to function" on the form, in her ability to make judgments on complex work-related decisions. (Tr. 972). He based these limitations on her concrete thinking and poor abstraction. (Tr. 972). He opined that she had marked limitations in her ability to interact with the public and co-workers. (Tr. 973). He opined that she had extreme limitations, defined as "no ability to function" on the form, in her ability to

interact with supervisors or to respond appropriately to usual work situations and to changes in a routine work setting. He based these limitations on her "substantial and insidious difficulties [with] social skills and relationships. Significant generalized psychiatric disturbance." (Tr. 973). The ALJ gave limited weight to Dr. Royer's opinion because it was based on Plaintiff's subjective complaints and was inconsistent with the record. (Tr. 19).

At the hearing on February 7, 2012, her counsel stated that Plaintiff was refusing to go to mental health treatment, and that "I think we're primarily looking at this as a physical disability that's rendering her unable to work. There appear to be some issues with getting along with co-workers or supervisors, but the major disabling impairment is the back and physical reasons." (Tr. 95).[2] Plaintiff now claims that Dr. Royer's opinion regarding her mental impairments should have been credited. Plaintiff asserts that:

> [T]he Administrative Law Judge failed to explain why he gave Dr. Royer's opinion little weight because it was based on the Plaintiff's subjective symptoms (Tr. Pg. 19) but gave the state agency psychologist's opinion significant weight as it related to interaction with the public (Tr. Pg. 18).

(Pl. Brief at 10). However, unlike Dr. Royer, the state agency psychologist had access to the entire record. Thus, her opinion was not based on subjective complaints.

It was proper to reject Dr. Royer's opinion on the ground that it was based on Plaintiff's subjective complaints. "[T]he extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of those statements." Social Security Ruling 96–7. Morris v. Barnhart, 78 Fed. Appx. 820, 825 (3d Cir. 2003) ("An ALJ may discredit a physician's opinion on disability that

---

[22] The Court also notes that, in a letter dated May 23, 2011, Plaintiff's counsel requested that the ALJ recontact Dr. Royer because "the marked and extreme limitations do not appear to be consistent with a Global Assessment of Functioning of 55." (Tr. 213).

was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted") (citing Fair v. Bowen, 885 F.2d 597, 605 (9th Cir.1989)). As discussed above, Plaintiff's subjective claims were properly found to be not credible. In fact, Plaintiff made multiple misrepresentations to Dr. Royer. She stated that she had never used drugs or alcohol and had never been involved in the legal system. She also never disclosed that she had been able to work throughout the relevant period, sometimes up to almost sixty hours a week. Moreover, Dr. Royer's opinion that Plaintiff had "no ability to function" with regard to interacting with coworkers and supervisors is contradicted by her ability to work.

Plaintiff also notes that the non-examining state agency psychologist found that Plaintiff was moderately impaired in carrying out detailed instructions, interacting appropriately with the public, supervisors, and coworkers, and responding appropriately to changes in a usual work setting. (Pl. Brief at 9). The ALJ did not include any limitations for Plaintiff's ability to interact appropriately with coworkers and supervisors, carry out detailed instructions, or respond appropriately to changes in the usual work environment. However, one of the jobs identified by the vocational examiner, potato chip sorter, would have accommodated those limitations. Thus, any error was harmless:

> [A] number of other courts have found harmless error where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the VE, according to the DOT. *E.g. Caldwell v. Barnhart,* 261 F. App'x 188, 190 (11th Cir.2008) (environmental exposure); *Powell v. Astrue,* CIV. SKG 10–02677, 2013 WL 3776948, at *9 (D.Md. July 17, 2013) (collecting Fourth Circuit district court cases). However, other courts have refused to find harmless error in certain circumstances, such as when numerous components factor into each occupation under the DOT. *E.g. Greenwood v. Barnhart,* 433 F.Supp.2d 915, 928 (N.D.Ill.2006) (observing "the reality that occupational availability is the VE's expertise and not the Court's.")

Rochek v. Colvin, 2:12-CV-01307, 2013 WL 4648340 at *12 (W.D. Pa. Aug. 23, 2013).

A potato chip sorter "[o]bserves potato chips on conveyor and removes chips that are burned, discolored, or broken." DICOT 526.687-010. A potato chip sorter has a "people" code of "8-taking instructions-helping-N-Not significant." Id. Many Courts have held that a position with this "people" code is one that can be performed despite limitations in interacting with others:

> [T]he descriptions of both loader of semi-conductor dies and touch-up screener do not mention dealing with people and identify the presence of taking instructions from and helping people in a "Not Significant" amount. *Id.* §§ 726.684–110, 726.687–030. Thus, inclusion of a limitation to occasional, brief, and superficial contact with coworkers and supervisors in the administrative law judge's hypothetical question would not have excluded two of the three jobs on which the administrative law judge relied, and any error in omitting that limitation from the question and from the RFC can only have been harmless.[6] *See, e.g., Larsen v. Astrue,* No. 1:10–CV–00936–JLT, 2011 WL 3359676, at *15 (E.D.Cal. Aug. 3, 2011) (jobs with "not significant" level of interaction in DOT appropriate for claimants with RFC specifying limited or occasional coworker contact); *Arsenault v. Astrue,* Civil No. 08–269–P–H, 2009 WL 982225, at *3 (D.Me. Apr. 12, 2009) (and cases cited therein).

Shorey v. Astrue, 1:11-CV-414-JAW, 2012 WL 3475790 at *6 (D. Me. July 13, 2012) aff'd, 1:11-CV-00414-JAW, 2012 WL 3477707 (D. Me. Aug. 14, 2012); See also Connor v. Colvin, 1:13-CV-00219-JAW, 2014 WL 3533466 at *4 (D. Me. July 16, 2014)("[T]he commissioner is correct that the error is harmless. The DOT rates all of the jobs as "Not Significant" for the category "People: 8 – Taking Instructions – Helping." DOT §§ 323.687-014, 323.687-010, 318.687-010, 209.587-034. This court has construed that rating as consistent with limitations to occasional, brief, and superficial contact with coworkers and supervisors and occasional interaction with the public.")(internal citations omitted); Barela v. Astrue, CV-09-01773-PHX-FJM, 2010 WL 5013829 at *6 (D. Ariz. Dec. 3, 2010); Ayscue v. Astrue, 5:08-CV-595-FL, 2009 WL 3172121 at *14-15 (E.D.N.C. Oct. 2, 2009); Anderson v. Comm'r of Soc. Sec., CIV. A. 07-1680 JAP, 2008 WL 619209 at *9 (D.N.J. Mar. 4, 2008); Seamon v. Astrue, 07-CV-0588-BBC, 2008 WL 3925829 at *12 (W.D. Wis. Aug. 19, 2008) aff'd, 364 F. App'x 243 (7th Cir. 2010);

Golas v. Colvin, 3:13-CV-4110-BN, 2014 WL 2587633 at *9 (N.D. Tex. June 10, 2014);

Rickman v. Colvin, 6:12-CV-01201-SI, 2013 WL 4773627 at *10-11 (D. Or. Sept. 4, 2013);

Forsythe v. Astrue, ED CV 10-403-PJW, 2011 WL 3516166 at *1 (C.D. Cal. Aug. 11, 2011);

Richardson v. Colvin, CIV-13-467-R, 2014 WL 1490958 at *4 (W.D. Okla. Apr. 15, 2014); Arti

v. Colvin, EDCV 12-661 AGR, 2013 WL 2417969 at *3 (C.D. Cal. June 3, 2013); Parker ex rel.

Parker v. Comm'r, Soc. Sec. Admin., 2:13-CV-19-DBH, 2014 WL 220705 at *5 (D. Me. Jan. 21,

2014); Lara v. Colvin, CIV-12-1249-L, 2014 WL 37746 at *4 (W.D. Okla. Jan. 6, 2014); Hewes

v. Astrue, 1:10-CV-513-JAW, 2011 WL 4501050 at *6  (D. Me. Sept. 27, 2011) aff'd, 1:10-CV-

00513-JAW, 2011 WL 4916460 (D. Me. Oct. 17, 2011); But see Henick v. Astrue, 2:11-CV-

147-NT, 2012 WL 283475 at *2-3 (D. Me. Jan. 30, 2012) aff'd, 2:11-CV-147-NT, 2012 WL

1074196 (D. Me. Mar. 28, 2012); Larsen v. Colvin, C13-2018-MJP, 2014 WL 3534032 at *5-6

(W.D. Wash. July 15, 2014)(Remanding despite DOT's identification of the "people" function as

"not significant" where vocational expert had specifically testified that claimant could not

perform past relevant work if limited to only occasional interaction with co-workers).

A potato chip sorter also only requires either a "low" or "markedly low" aptitude ability

and does not require a worker to talk, hear, climb, balance, stoop, kneel, crouch, or crawl.

DICOT 526.687-010. Thus, any error by the ALJ in not accommodating for moderate limitations

in interacting with coworkers, taking instructions, and dealing with changes in the work

environment was harmless. Plaintiff bears the ultimate burden of proving disability within the

meaning of the Act, and, although the ALJ bears the burden at step five, Plaintiff has not

established the ALJ erred in evaluating her mental impairments or that her mental impairments

would prevent her from working as a potato chip sorter.

**D.      The ALJ's evaluation of Plaintiff's other alleged impairments**

Plaintiff asserts that the ALJ "did not address" Plaintiff's "bipolar disorder, borderline personality disorder, leg length discrepancy, enteritis, irritable bowel syndrome, urinary tract infection, upper respiratory infection, colitis and diverticulitis" at step two. (Pl. Brief at 10-11). At step two, the social security regulations contemplate that the administrative law judge first consider whether there are any medically determinable impairments and then determine whether any of the medically determinable impairments are "severe." 20 C.F.R. § 404.1529.   An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  Id. § 404.1521.   Generally, an error at step two is harmless because it is a threshold test. 20 C.F.R. § 404.1520(c)-(g). As long as one impairment is found to be severe, all medically determinable impairments are considered at subsequent steps, including non-severe impairments. Id.; Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005); Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 149 (3d Cir. 2007). For instance, in Rutherford, an error at step two was harmless and did not impact subsequent steps because the claimant there "never mentioned obesity as a condition that contributed to her inability to work."  Id.

Here, the ALJ found that Plaintiff's bipolar disorder and borderline personality disorder to be severe, and considered them at steps three, four, and five. (Tr. 13). The ALJ found that Plaintiff's colitis was non-severe because it did not cause any functional limitations. (Tr. 14). Thus, the ALJ did address colitis, and Plaintiff has not alleged that there are any functional limitations from her colitis. Consequently, there was no error in the ALJ's finding with regard to colitis. The ALJ found Plaintiff's knee impairment to be both severe and nonsevere, but Plaintiff has not alleged any functional limitations beyond the limitations in climbing, the use of foot/leg

pedals, kneeling, crouching, squatting or crawling that the ALJ included in his RFC assessment. Similarly, Plaintiff has never alleged any functional limitations from her leg length discrepancy, irritable bowel syndrome, urinary tract infection, upper respiratory infection, or diverticulitis, so any failure to address these diseases was harmless error.

### VII. Additional Medical Records

The Court notes that Plaintiff produced additional medical records to the Appeals Council. (Tr. 6, 938-1036). When the Appeals Council denies review, the only way for the Court to consider records that were not before the ALJ is in the context of a remand pursuant to sentence six of 405(g), 42 U.S.C. ("sentence six remand"). A sentence six remand requires, *inter alia*, that the evidence be omitted for good cause, new (not cumulative) and material (raises a reasonable possibility that the ALJ would have decided differently). Id.; Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Here, the medical records existed prior to the ALJ issuing her decision, and Plaintiff has not asserted good cause for omitting them. Moreover, the records would only support the ALJ's decision. For instance, on November 13, 2011, less than a month after her second hearing, Plaintiff was treated in the emergency room for reproductive system complaints and denied musculoskeletal pain. (Tr. 1021). Thus, there is no reasonable possibility these records would have changed the ALJ's decision. Consequently, the Court will not remand pursuant to Sentence Six or consider the additional records.

### VIII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at

200; <u>Pierce</u>, 487 U.S. at 552; <u>Hartranft</u>, 181 F.3d at 360; <u>Plummer</u>, 186 F.3d at 427; <u>Jones</u>, 364

F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a

mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

<u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the

relevant evidence as adequate to support the conclusion reached by the Acting Commissioner,

then the Acting Commissioner's determination is supported by substantial evidence and stands.

<u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant

evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner

pursuant to 42 U.S.C. § 405(g).

 An appropriate Order in accordance with this Memorandum will follow.

Dated: August 28, 2014        <u>   s/Gerald B. Cohn   </u>
              GERALD B. COHN
          UNITED STATES MAGISTRATE JUDGE